FILED

MAR - 6 2008

ROBERT T. BRAITHWAITE
U.S. MAGISTRATE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA<br>Plaintiff(s),<br><br>v.<br><br>DANIEL BETRAN-DIAS<br>Defendant(s). | REPORT AND RECOMMENDATIONS<br><br>2:07-CR-00253-DB |
|---|---|

Before the court is a Motion to Suppress submitted by Defendant, Daniel Beltran-Dias. (File Entry # 19.) After thorough review and consideration of the testimony and evidence presented at the evidentiary hearing, the parties' pleadings, and the subsequent oral arguments, the court recommends that Defendant's Motion to Suppress be granted.

### FACTUAL BACKGROUND

On March 12, 2007, Utah Highway Patrol (hereafter referred to as "UHP") trooper Nick Bowles was in his patrol vehicle on I-70 near Salina, Utah. (Document # 25, Official Transcript of Evidentiary Hearing on Motion to Suppress, held October 22, 2007 (hereafter referred to as "Tr. at __"), at 5). The trooper stated that he: had worked for the UHP for seven years; spent one year on the UHP Criminal Interdiction Team; and had made approximately 8,000 traffic stops

1

and 500 drug arrests. (Tr. at 4.) A summary of the trooper's testimony–in chronological sequence–of events relevant to the issues of investigation, detention, and arrest are set forth below. Matters the trooper said he relied on in detaining and ultimately arresting defendant are indicated numerically in parenthesis.

While on patrol, trooper Bowles didn't recognize the license plates on a pickup truck driven by Defendant, so he followed Defendant "to take a closer look." The trooper then saw that the passenger vehicle had commercial license plates attached–a situation he had never encountered before–so he asked dispatch to check the license plate number. Dispatch advised that they'd run the Nebraska plate "three different ways" and "it came back 'not on file.'" (Tr. at 5-6.)

The trooper stopped the vehicle to do a registration check, and approached Defendant who was the driver and sole occupant of the truck. While conversing with Defendant, the trooper said he noticed: (1) "a strong odor of air freshener coming out," and, (2) "just a small luggage bag on the back seat." (Tr. at 5, 6, 18.)

While Defendant looked for registration to the vehicle the trooper asked about Defendant's travels. (3) Defendant said he was traveling from Beachwood California–near Reno, Nevada–and was headed to Nebraska. This struck the trooper as unusual since I-80 provides a direct route from Reno to Nebraska, and Defendant was on I-70, "a couple of hundred miles south of the most correct route." (Tr. at 6-7.)

Defendant ultimately provided the trooper with registration to the vehicle he was operating, and the trooper said "it appeared to be valid for that vehicle for the license plate."

2

However, rather than sending Defendant on his way, the trooper asked Defendant to step out of his vehicle so he could show him why he'd stopped the vehicle. [First post-stop detention.] As they walked to the back of the pickup, the trooper noticed (4) a gas can and (5) wheel well covers in the bed of the pickup. (Tr. at 8.) After pointing to the license plates and explaining that, "it didn't come back on the computer check," the trooper returned the registration to Defendant, and each began walking to their respective vehicles. (Tr. at 7.)

As the trooper was returning to his vehicle he felt like there "were a few things that were out of the ordinary" (namely, 1-5 above). (Tr. at 8.) As Defendant was opening his driver side door to get in, the trooper asked Defendant to talk further with him. (Tr at 9-10.) [Second post-stop detention.] Defendant shut his door and met the trooper again at the back of the pickup. (Tr. at 9.) Defendant told the trooper he'd been in California for five days. The trooper testified that this furthered his concerns, because he would expect a person (6) on a five day trip to have five separate pairs of pants and five shirts (Tr. at 19), and (7) that it is very unusual for someone to carry full gas cans in their vehicles unless they have four-wheelers, and that "the ones that I've found gas tanks that had narcotics in them, a hundred percent of them had full gas cans in the back of the vehicle." (Tr at 20.) Yet the trooper once again indicated the defendant could go and thanked him. Defendant returned to his vehicle and got in. (Tr. at 10.)

As Defendant was doing this, the trooper said he further noticed that the driver side rear wheel well was newer than the passenger side wheel well, re-approached Defendant, speaking to him through the passenger side window, and asked him if he could look at his truck. The trooper said that Defendant consented. (Tr at 11-12, 26-31, 35). [Third post-stop detention.]

3

The trooper looked underneath the truck and found that the bands securing gas hoses were "brand new." He also said he could see where old straps had been in contrast to where the tank had been. These facts and further visual inspection under the truck where the trooper observed new bolts and recently tooled nuts led him to the conclusion that the truck had been re-tooled recently. (Tr. at 12-13.)

The officer stated it was his opinion that Defendant was free to go had he wished, up until the time of his visual inspection under the truck. (Tr. at 31-2.)

The trooper called for a Spanish speaking officer (officer Trent Halliday of the Salina police department), and thereafter the trooper said Defendant consented to search inside the gas tank. (Tr at 12.)

The trooper wasn't able to manipulate his fiber optic scope all the way into the gas tank, so he requested (through officer Halliday) permission to move the vehicle to a garage and drop the tank. Officer Halliday said Defendant consented. (Tr. at 14.)

At the garage the gas tank was dropped and six packages of suspected cocaine were found in the gas tank. (Tr. at 14.)

As to the ability of the trooper and Defendant to communicate, the trooper testified: that Defendant spoke in "broken English;" that it seemed the defendant could "understand me but didn't have a full comprehension of everything; that "I speak very little Spanish, but I felt like he did understand me for the most part;" and that he remembered Defendant "shaking his head 'yes'" to consent to the trooper looking at the truck. (Tr. at 10.) Finally, the trooper said he was confident in his ability to conduct a traffic stop involving Spanish-speaking people and finding out

4

where people "were coming to and going to," but that he needed trooper Halliday to explain dropping a gas tank. (Tr. at 22.)

## PROCEDURAL HISTORY

Defendant entered a waiver of indictment and consent to proceeding on the charges against him by Complaint on April 23, 2007 (File Entry #1). An information was filed on April 24, 2007. (File Entry #14.) On July 17, 2007, Defendant filed his Motion to Suppress the evidence obtained during the stop and search. (File Entry #19.) The case was assigned to United States District Judge Dee Benson, who referred the case to United States Magistrate Judge Robert T. Braithwaite, pursuant to 28 U.S.C. Sec. 636(b)(1)(B), on September 28, 2007. (File Entry #22.)

An evidentiary hearing on the Motion to Suppress was held on October 22, 2007. (File Entry #24.) Defendant then filed a memorandum in support of his Motion on December 12, 2007. (File Entry #28.) The Government filed its memorandum opposing the Motion to Suppress on December 31, 2007. (File Entry #29.)

On February 25, 2008, the court held oral arguments. (File Entry #32); and thereupon took the matter under advisement.

## ANALYSIS

Defendant seeks to suppress any evidence seized during the March 12, 2007 traffic stop. In addition to challenging the initial stop, Defendant argues that the officer's delay in completing

5

the traffic stop impermissibly exceeded both the duration and scope of the initial stop, resulting in Defendant's unlawful, continued detention. Defendant further argues that no free, unequivocal consent to search was given by Defendant. As a result, Defendant argues that all evidence gained through the search of his vehicle must be suppressed.

### I. The Initial Stop

The court first addresses Defendant's argument that Officer Bowles conducted a traffic stop without reasonable articulable suspicion that a law violation had occurred.

> [A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995), *cert. denied*, 518 U.S. 1007 (1996).

In this case, Officer Bowles testified that he observed Defendant operating a passenger vehicle with a commercial vehicle licence plate–a situation he had never encountered in seven years and 8,000 traffic stops. Dispatch advised that they'd run the plate three different ways and that it came back "not on file." (Tr. at 5-6.)

This created a situation in which the officer was justified in stopping the vehicle to ascertain whether any number of violations may have occurred, ranging from a licence plate violation, to the possibility of the vehicle being stolen with replacement plates attached. Because Officer Bowles had reasonable articulable suspicion that a traffic violation was occurring, the stop was justified at its inception. See *Botero-Ospina*, 71 F.3d at 787.

## Post-Stop Detention

The court next addresses Defendant's assertion that the officer extended the initial traffic stop impermissibly, resulting in Defendant's unlawful, continued detention. The court believes Defendant's assertion has merit.

After the initial stop, the officer properly investigated the status of the vehicle's license plates, registration, and Defendant's possession of the vehicle, by examining Defendant's paperwork and visiting with him.

The trooper's review of Defendant's documents led him to the conclusion that Defendant's registration "...appeared to be valid for the license plate." (Tr. at 7.) The Trooper did not tell Defendant he was free to go however, and instead asked him to exit the vehicle.

The reason the trooper did not allow Defendant to leave was because during his conversation with Defendant he noticed items 1-3 in the Statement of Facts which the trooper suspected might indicate potential drug involvement by Defendant: (1) the use of an air freshener; (2) the use of a small travel bag (the officer later learned that Defendant had traveled for five days and came up with an arbitrary one-shirt-and-pant-per-day rule for all travelers, concluding that Defendant should have had five pairs of pants and five shirts (Tr. at 18, 19.); (3) traveling a route that was less than the shortest route between two points (going from California to Nebraska via a west-east route different than I-80).

However, potential innocent explanations exist as to all three of these items. (1) Air fresheners are available to the public and are used for a variety of reasons unrelated to

camouflaging drug odors. (2) Use of minimal luggage can be the result of economics and personal preference among other factors. As defense counsel noted on cross-examination (to which the trooper was non-committal), a person might opt to pack just "five pairs of undergarments and maybe one pair of pants." (Tr. At 19.) (3) Traveling a route other than the most-direct option can be for non-criminal activity, such as for the purpose of visiting people and points of interest not necessarily located exactly on a direct route.

In determining whether an officer has a reasonable suspicion of criminal activity which would justify further detention of an individual, the totality of the circumstances must be considered, and "inchoate suspicions and unparticularized hunches do not provide reasonable suspicion." *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir. 1994).

Under the totality of the circumstances test, the officer lacked sufficient evidence to further detain the defendant. In fact, the officer admitted this later in his testimony when he said Defendant was free to go at this point. (Tr. at 31-2.) Yet the officer did not tell Defendant he was free to go, instead asking him to come to the rear of the pickup with him.

This was the first, post-stop detention in the facts of this case, and was an impermissible shifting of the focus of the stop from a traffic stop to a delay tactic to extend the investigation into possible drug involvement.

Instructive cases in this area include:

> We have consistently held an officer who retains a driver's paperwork while asking the persons questions unrelated to the initial purpose of a traffic stop must have reasonable suspicion to do so because such a detention constitutes a 'seizure' within the meaning of the Fourth Amendment. *United States v. Walker*, 933 F.2d 812, 817 (10th Cir. 1991).

And,

8

Defendant to reject the officers request for further information and opt to drive off leaving the trooper by the passenger window).

The court agrees with the arresting officer that there was not sufficient evidence to hold Defendant at the time any of the three post-stop detentions. (Again, the officer testified Defendant was free to go until the officer made a visual inspection under the truck. (Tr at 31-2.) The officer's investigative approach to this case–intentionally or unintentionally–appears to have been to keep Defendant from leaving by engaging him in conversation until the officer developed probable cause to make an arrest.

Thus, the court recommends that Defendant's Motion to Suppress be granted.

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress evidence seized during the search of Defendant's vehicle ( File Entry # 19) be granted.

Copies of the foregoing report and recommendation are being provided to the parties who are hereby noticed of their right to object to the same. The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. Section 636(b), within ten (10) days after receiving it. Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellant review.

DATED this 6 day of March of 2008.

BY THE COURT:

_____
**ROBERT T. BRAITHWAITE**
**U.S. Magistrate Judge**

DATED this 6 day of March of 2008.

BY THE COURT:

_____
ROBERT T. BRAITHWAITE
U.S. Magistrate Judge