IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH – CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>DANIEL BETRAN-DIAS,<br><br>    Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:07-CR-253<br><br>Judge Dee Benson |

Before the Court is the Report and Recommendation issued by Magistrate Judge Robert T. Braithwaite, recommending that Defendant's Motion to Suppress evidence seized during the search of Defendant's vehicle be granted.  The government filed objections to the Report and Recommendation.  Having considered the magistrate judge's Report and Recommendation and the government's objections, the Court hereby declines to adopt the Report and Recommendation and denies Defendant's motion.

## I.  Findings of Fact

Although the government challenges the magistrate judge's legal conclusions, the facts are undisputed.  On March 12, 2007, Trooper Nick Bowles, of the Utah Highway Patrol who has extensive experience with drug arrests, noticed a white pickup truck traveling eastbound on Interstate-70, near Salina, Utah.  The truck had commercial license plates, and because the trooper had never seen commercial plates on a passenger vehicle, he found this unusual.  After asking dispatch to check the license plate number, and being informed that the number was not on file, the trooper pulled Defendant over in order to perform a registration check.  When he

approached Defendant, the trooper smelled a strong scent of air freshener and noticed a small piece of luggage on the back seat. When the trooper asked for the vehicle's registration and Defendant's identification, Defendant presented a Mexico identification card with the name of Marcos Mejia. As Defendant was getting his registration, the trooper asked about Defendant's travels. Defendant's native tongue is Spanish; however, he was able to speak in broken English and he apparently understood because he responded by saying that he was traveling from Beachwood, California to Nebraska. The trooper found this unusual considering Interstate-80 is a more direct route to his destination. This information, together with the strong scent of air freshener and the small amount of luggage in the back seat gave the trooper some suspicion that Defendant may be involved in drug activity.

The trooper checked the car's registration and found it valid for the vehicle, and that it matched the license plate. He wanted to be sure Defendant understood why he was pulled over and asked Defendant to walk to the rear of the truck with him so he could show him the commercial license plate and explain that he was stopped because the license plate number for some reason didn't come back on the computer check. As the trooper and Defendant walked to the back of the truck, the trooper noticed a full gas can and wheel-well covers in the bed of the truck. In the trooper's experience, every time he had encountered a person transporting drugs in a car's gas tank a gas can was found in the vehicle. As a result of this additional observation, the trooper's suspicions about Defendant increased.

Then, after returning the registration to Defendant, the trooper decided he wanted to speak further with Defendant. As Defendant was returning to his truck, the trooper called him to come back to talk with him. The trooper asked Defendant more questions about where he had

been traveling.  Defendant indicated that he had been in California for five days, and that he was returning to Nebraska.  The trooper thanked Defendant and the two men began walking back to their respective vehicles.

While returning to his patrol car, the trooper noticed that the driver side rear wheel-well cover on Defendant's truck was newer than the passenger side wheel-well cover.  This further increased the trooper's suspicions.  Based on his training and experience, the trooper was aware that such alterations are often associated with drug-smuggling activity.  At this point, the trooper felt confident Defendant was transporting drugs and he wanted to take a closer look at Defendant's truck.  Therefore, he approached Defendant from the passenger side window, and asked him in Spanish if he could look at his truck.  Defendant agreed and exited the truck.

The trooper looked underneath the bed of the truck, particularly underneath the gas tank. He noticed that new straps secured the gas tank hoses, and that there were marks on the hoses where the straps had been recently removed.  The trooper also noticed that the bolts had rubberized caps and the nuts were recently tooled.  Because it appeared to the trooper that the gas tank had recently been taken off the truck, he wanted to take a look inside of it.  However, given the complexity of looking in the gas tank with a fiber-optic scope, and the possibility that a full inspection would require taking the truck to a garage, the trooper wanted to make sure he could communicate effectively with Defendant, so he called for a Spanish-speaking officer, Officer Trent Halliday.  While they waited for Officer Halliday to arrive, which took only a few minutes as they were close to the nearby town of Salina, Utah, the trooper asked Defendant if there were any narcotics in the vehicle – specifically marijuana, cocaine, or methamphetamine. In response, Defendant looked at the ground and quietly replied "no."

3

Once Officer Halliday arrived, he asked Defendant in Spanish if Trooper Bowles could look at the gas tank. Defendant agreed. Trooper Bowles tried to look in the gas tank with a fiber-optic scope, but the mouth of the tank had a device that prevented the scope from entering. The trooper asked Defendant whether he had recently worked on the truck, and Defendant said the four-wheel drive had been worked on. Officer Halliday then asked for Defendant's permission to take the truck to a garage, and once again, Defendant agreed. At the garage, the gas tank was removed from the truck. It contained six packages of cocaine.

## II. Discussion

Defendant seeks to suppress the evidence seized during the search of Defendant's vehicle. The government opposes the motion, arguing that reasonable suspicion existed to justify the stop and detention and, therefore the evidence was lawfully obtained. In his Report and Recommendation, the magistrate judge disagrees with the government, finding that reasonable suspicion did not exist to detain Defendant for the entire length of the stop, and thus recommends that Defendant's motion to suppress be granted.

The magistrate judge found that the initial traffic stop was justified because the commercial license plate number did not appear to be on file when the trooper checked with dispatch. *Id.* at 6. However, the magistrate judge found that once the trooper determined that the registration and commercial plate were valid, the remainder of the actions taken by the trooper were improper and constituted an extended unlawful detention. *Id.* at 7-10. The magistrate judge considered the air freshener, the small bag of luggage, and the indirect route of travel, in determining whether the trooper had reasonable suspicion to continue to detain Defendant once the trooper concluded that the license plate was valid. *Id.* at 7. Only these

4

factors were considered.  The magistrate judge determined under the circumstances that the trooper's decision to take Defendant to the rear of the truck to explain why he was pulled over was improper.

Each one of these three factors was viewed independently, and the magistrate judge provided innocent explanations for each.  *Id.* at 7-8.  He concluded that air freshener can be used for reasons "unrelated to camouflaging drug odors," and a small luggage bag "can be the result of economics and personal preference."  *Id.*  Furthermore, "visiting people and points of interest not necessarily located exactly on a direct route" might provide an innocent reason for traveling on Interstate-70 rather than Interstate-80.  *Id.* at 8.  Because the magistrate judge was unpersuaded by these three factors, the magistrate judge found that under the totality of the circumstances, there was not enough evidence to create reasonable suspicion to justify further detaining Defendant, specifically, to take Defendant to the rear of the truck to explain to Defendant why he was pulled over.  *Id.*  Accordingly, the magistrate judge recommended that the remainder of the stop constituted an unlawful detention, and the evidence seized was fruit of the poisonous tree and thus inadmissible.  *Id.* at 8-9.

The Court now reviews the magistrate judge's recommendation *de novo*.  28 U.S.C. § 636(b)(1)(C).

The Court agrees with the magistrate judge that the initial traffic stop was valid under *Terry v. Ohio,* 392 U.S. 1, 20 (1968).  The Court, however, disagrees with the magistrate judge's finding that the trooper's act of taking Defendant to the rear of the truck to explain why he was pulled over was unreasonable and improper under the Fourth Amendment.  It was certainly reasonable for the trooper to take a brief amount of time to explain to Defendant why he had

been stopped.  It is clear that the trooper wanted Defendant to understand why he pulled him over, and because the trooper only had a basic understanding of Spanish, he decided to take Defendant to the back of the truck where he could actually point to the license plate.  This was reasonable.  Nothing could be more related to a traffic stop than an explanation of it.

Once the trooper explained to Defendant why he was pulled over, he decided to talk with Defendant further because his suspicions about Defendant were growing.  His initial suspicions based on the air freshener, the small piece of luggage, and Defendant's indirect route of travel were only increased by the plain view observation of the wheel-well covers and full gas can in the bed of the truck.  At this point, the trooper engaged the Defendant in further conversation about Defendant's travels; specifically, discussing the fact Defendant had been in California for five days.

This brief additional detention of Defendant was proper if the trooper had reasonable suspicion of criminal activity.  *See, e.g., United States v. Cervine,* 347 F.3d 865, 868-69 (10th Cir. 2003); *United States v. Bradford,* 423 F.3d 1149, 1157 (10th Cir. 2005).  When determining whether reasonable suspicion exists, the Court looks to the "totality of the circumstances" to see whether the officer had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273 (2002); *United States v. Bradford,* 423 F.3d 1149, 1157 (10th Cir. 2005).  Furthermore, reasonable suspicion is not dependent on any one factor; rather, "the 'whole picture' must be taken into account."  *United States v. Bloom,* 975 F.2d 1447, 1456 (10th Cir. 1992) (quoting *United States v. Cortez,* 449 U.S. 411, 417-18 (1981)).  Common sense and human experience must be taken into account, and the courts should give some deference to an officer's ability to distinguish between innocent and suspicious circumstances.

6

*See, e.g., United States v. Melendez-Garcia,* 28 F.3d 1046, 1052 (10th Cir. 1994); *United States v. Lopez-Martinez,* 25 F.3d 1481, 1484 (10th Cir. 1994).

The trooper, upon approaching Defendant initially, was presented with evidence that caught his attention. Based on his training and experience Trooper Bowles knew that drug traffickers often use air freshener to mask the odor of drugs. Furthermore, the small amount of luggage for a cross-country trip, while certainly not dispositive, contributed to create additional suspicion. Also suspicious was Defendant's route on Interstate-70 instead of Interstate-80, which added at least two hundred extra miles to the trip Defendant claimed he was making. Trooper Bowles was also well aware that Interstate-70 is a commonly traveled route for drug traffickers.

Further, the gas can in Defendant's truck provided additional evidence. As Trooper Bowles testified, in his experience every drug trafficker transporting drugs in a vehicle's gas tank had a gas can with them. Finally, the wheel-well covers in the bed of the truck, which suggested alterations and concealment, provided additional evidence supporting reasonable suspicion.

Based on the foregoing, the Court finds that at the time immediately after walking to the back of Defendant's vehicle to point out the license plate the trooper had reasonable suspicion based on the totality of the circumstances to further detain Defendant. No single factor is dispositive, but when all of the evidence is viewed together to create the 'whole picture,' coupled with Trooper Bowles' experience with drug trafficking behavior, the Court concludes reasonable suspicion existed.

The encounter between the trooper and Defendant did not end there, however.  After Defendant told the trooper he had been in California for five days, the trooper noticed that the wheel-well cover on the driver side rear was different, possibly newer, than the passenger side wheel-well cover.  The trooper confronted Defendant once again, and this time asked him if he could look at his truck.  Defendant agreed.

The inconsistent wheel-well covers provided another piece of evidence supporting reasonable suspicion, and together with the other observations, provided a basis to further briefly detain Defendant.  Throughout the entire encounter, the trooper was presented with more and more evidence to create reasonable suspicion, and justify a brief additional detention to allow the officer to attempt to allay his suspicions.  Reasonable suspicion existed to detain Defendant and take a closer look at the truck.

Then, the trooper looked under the truck and saw the new straps securing the gas tank hoses, the bolts, and the recently tooled nuts, all of which provide compelling evidence that the gas tank had recently been removed.  This evidence added to the continuous manifestation of suspicious circumstances, which justified the continued detention.  At this point there had been no search of the truck.  Trooper Bowles' efforts to investigate his suspicions had been limited to his plain-view observations and his conversations with Defendant.  After seeing the gas tank the trooper wanted to do a more thorough examination of the gas tank.  In order to undertake this search the trooper properly wanted to obtain Defendant's consent.  Because he wanted to make sure Defendant understood what he was asking he took the additional reasonable precaution of contacting a Spanish-speaking officer to join them.  As they waited for Officer Halliday's

arrival, the trooper asked Defendant if there were any narcotics in the vehicle.  Defendant hesitated and said "no."

When Officer Halliday arrived, Defendant agreed first to the search of the gas tank on the side of the road, and later, to the trooper's moving the truck to a garage where the gas tank could be removed.  The standard for determining whether consent was given is one of voluntariness from the totality of the circumstances.  *See, e.g., United States v. Mendoza-Salgado*, 964 F.2d 993, 1010-11 (10th Cir. 1992).  The evidence shows that Defendant provided voluntary consent.  There is no evidence to suggest that Defendant did not understand what he was consenting to, or that Defendant was unclear as to Trooper Bowles' intentions.  Consent was knowingly and voluntarily given.

### III.  Conclusion

Based on the foregoing, the Court declines to adopt the magistrate judge's Report and Recommendation, sustains the United States' objection, and DENIES Defendant's Motion to Suppress.

IT IS SO ORDERED.

DATED this 6th day of June, 2008.

_____
Dee Benson
United States District Judge